UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                Plaintiff,

      v.

MAURICE CAMPBELL,

                Defendant.

_____

REPORT & RECOMMENDATION

06-CR-6025L

## PRELIMINARY STATEMENT

By Order of Hon. David G. Larimer, United States District Judge, dated March 3, 2006, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 13).

Defendant Maurice Campbell is charged in a three-count indictment. Specifically, the first count charges Campbell with possession with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Count Two of the Indictment charges Campbell with possession of a firearm in furtherance of the drug trafficking crime charged in the first count, in violation of 18 U.S.C. § 924(c)(1). The final count charges Campbell with the unlawful possession of a firearm after having been convicted of a crime punishable by a term of imprisonment exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Docket # 10). Currently before this Court for Report and Recommendation is Campbell's motion to

suppress tangible evidence seized from his person and from the residence at 500 Garson Avenue. (Docket # 15).[1]

## FACTUAL BACKGROUND

On June 13 and July 17, 2006, this Court conducted an evidentiary hearing on Campbell's motion to suppress evidence. At the hearing, the government offered the testimony of Sergeant Dean Ussia of the Rochester Police Department, as well as Campbell's cousin, Cassandra Harrell. No witnesses were called by the defense.

**Testimony of Sergeant Ussia**

This case arises from the pursuit, arrest and search of Campbell by Sergeant Ussia on December 24, 2005. Ussia testified that he had had "almost daily contact" with Campbell during the approximate six-year period prior to that arrest. (Tr.A 8).[2] During that period, Ussia had received information from other officers regarding Campbell's possession of weapons and involvement in robberies and narcotics transactions. (Tr.A 47). In addition, Ussia had been personally involved in arresting Campbell the previous month for evidence tampering. At that time, Campbell had indicated that he resided at 152 Pennsylvania Avenue, an address where

---

[1] Campbell's omnibus motions also sought, *inter alia*, severance of Count Three of the Indictment, *Jencks* material, rulings on evidentiary matters under Rules 404, 608 and 609 of the Federal Rules of Evidence and the preservation of rough notes. (Docket # 15). Each of these requests was either resolved by the parties or decided in open court by the undersigned on May 10, 2006. (Docket ## 17, 20).

[2] The transcript of the suppression hearing conducted before this Court on June 13, 2006, shall hereinafter be referenced as "Tr.A __." (Docket # 23).
  The transcript of the suppression hearing conducted before this Court on July 17, 2006, shall hereinafter be referenced as "Tr.B __." (Docket # 24).

Ussia had had contact with Campbell earlier that fall when he responded to a call from Campbell that he had been shot. (Tr.A 9).

On December 24, 2005, at approximately 1:49 a.m., Ussia received a call from the Office of Emergency Communications concerning a burglary in progress at 452 Garson Avenue. (Tr.A 10; G.Ex. 1).[3]  Ussia testified that the area of the city of Rochester in which 452 Garson Avenue is located has a high incidence of narcotics and gun-related activity, as well as robberies and fights. (Tr.A 10).

Ussia arrived in the area of 452 Garson Avenue within one or two minutes after he received the call. As Ussia was driving on Garson Avenue toward the residence, he saw an individual walking southbound. (Tr.A 11). As he drove closer, the individual turned and Ussia recognized him as Campbell; Campbell was wearing a black coat with a hooded sweatshirt underneath. (Tr.A 12, 15). From a distance of approximately ten feet, he called out to Campbell and told him to stop. (Tr.A 12-13). Campbell did not respond, but turned away and continued walking. (Tr.A 13). Ussia again directed Campbell to stop, this time calling out, "Juice [Campbell's nickname], stop." Instead of stopping, however, Campbell started to run. (Tr.A 13).

Ussia followed him in his police car as Campbell proceeded to run down the sidewalk. The sidewalk was covered in ice, however, and Campbell fell. As he fell, Campbell was reaching into the right-hand pocket of his sweatshirt and attempting to remove something. (Tr.A 15). Campbell then got up and continued to run eastbound. Ussia continued to pursue him

---

[3] During the suppression hearing, the government offered and played for the Court a tape of the emergency call reporting the robbery at 452 Garson Avenue, as well as the police radio broadcasts between Officer Ussia and the Office of Emergency Communications. (G.Ex. 1).

in his car and transmitted a radio broadcast that he was involved in a chase with Campbell. (Tr.A 14-15, 39). Campbell again fell on the ice as he ran, still continuing to try to remove the object from his pocket. After traveling twenty to thirty feet, Campbell fell for a third time in the area of 500 Garson Avenue. This time, Campbell pulled a shiny object partially out of his pocket, which Ussia testified he could see "fairly well" and was "fairly convinced" was a gun. (Tr.A 16). Campbell then ran up the sidewalk leading to 500 Garson Avenue and onto the porch. According to Ussia, 500 Garson Avenue is a two-family dwelling. A door on the left side of the residence leads directly into the downstairs apartment, while the door on the right side of the porch leads to a staircase going to the upstairs apartment. (Tr.A 19). As Campbell ran onto the porch, the door on the right side of the residence was completely open, and Ussia was able to see into a small foyer leading to the staircase. (Tr.A 19; G.Ex. 2). Campbell ran into the foyer and tried to close the door behind him. (Tr.A 17).

At this time, Officer Smith arrived to assist Ussia. (Tr.A 18). Although the officers were unable to catch Campbell before he entered the residence, Ussia was able to prevent Campbell from closing the door. With Smith's assistance, Ussia forced the door open, trapping Campbell behind the door in the corner of the foyer. Although it was dark, the officers each took hold of one of Campbell's arms and pulled him towards the open side of the foyer. As they did, they heard something heavy fall to the ground with a "thud." (Tr.A 20; G.Ex. 3). Campbell was then handcuffed and brought out of the residence and onto the porch.

Within two minutes after Campbell's apprehension and removal from the foyer, Smith looked behind the door leading into the foyer and observed on the floor in the corner a semi-automatic, chrome-plated handgun with an artificial white pearl grip. (Tr.A 23). He

advised Ussia of his observations, and Ussia then went inside to look at the gun, which, he testified, was the shiny object that he had witnessed Campbell partially remove from his pocket. (Tr.A 23-24).

Following the discovery of the firearm, another officer performed a search of Campbell's person. (Tr.A 23, 30). During the search, nineteen bags of crack cocaine were recovered from Campbell's pants pocket. (Tr.A 30).

**Testimony of Cassandra Harrell**

Campbell's cousin, Cassandra Harrell testified that on December 24, 2005, she resided in the upstairs apartment at 500 Garson Avenue. (Tr.A 56-57). Harrell lived in the apartment with her three-year-old daughter and did not provide a key to anyone else. (Tr.A 58-59). Harrell further testified that approximately twice per week Campbell would spent the night in her apartment to "watch over" her and her daughter and "to make sure [they] were safe." (Tr.A 62). Campbell did not, however, have his own key to the apartment. Rather, Harrell provided him with a key when he went to the store. (Tr.A 63).

Harrell testified that Campbell had spent the day on December 24, 2005, visiting with her at her apartment. Although he planned to return and spend the night at Harrell's apartment, Campbell left some time after 9:00 p.m. in order to visit a friend. (Tr.A 67-68). Later that night, while she was talking with her boyfriend, Harrell recalled hearing Campbell's arrest by the police at the bottom of the stairway leading up to her apartment. (Tr.A 71, 77). Harrell did not come out of her apartment, nor did the police knock on her door to ask her any questions.

(Tr.A 71-72). Finally, Harrell testified that she did not recall seeing a firearm in the downstairs foyer area at any time on December 24, 2005. (Tr.B 7-8).

## **REPORT AND RECOMMENDATION**

Campbell moves to suppress the firearm seized from the downstairs foyer at 500 Garson Avenue, as well as the crack cocaine seized from his person. Specifically, Campbell argues that his stop was unsupported by either probable cause or reasonable suspicion and the evidence seized thus should be suppressed as the fruit of that unlawful stop. (Docket # 15). The government opposes Campbell's motion.[4] (Docket # 16).

In analyzing Campbell's motion, this Court must first consider the lawfulness of the initial stop and detention of Campbell. If the initial stop and seizure was proper, a further inquiry must be made to determine the lawfulness of the seizure of the narcotics from Campbell's person and the firearm from the foyer in which he was ultimately apprehended.

The Fourth Amendment to the United States Constitution protects "[t]he right of the people . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Notwithstanding that constitutional protection, a police officer is permitted to briefly stop an individual and frisk for weapons if the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry v.*

---

[4] The government also argues that Campbell lacks standing to challenge the search of the foyer at 500 Garson Avenue. (Docket # 16). Upon the testimony and affidavit (Docket # 19) submitted by the resident of that address, Cassandra Harrell, I find that Campbell was an overnight guest who had an expectation of privacy in the residence. *See Minnesota v. Olson*, 495 U.S. 91, 98 (1990) (overnight guest has legitimate expectation of privacy in host's home); *United States v. Fields*, 113 F.3d 313, 320 (2d Cir.) ("society recognizes as legitimate the expectation of privacy possessed by an overnight guest – even though he has at best a fleeting connection to his host's home") (citing *Minnesota v. Olson*, 495 U.S. at 98), *cert. denied*, 522 U.S. 976 (1997).

6

*Ohio*, 392 U.S. 1, 30 (1968).  A protective search under *Terry* must be of a character that can be described as a "minimal intrusion."  *Illinois v. Wardlow*, 528 U.S. 119, 126 (2000) ("The *Terry* stop is a far more minimal intrusion [than an arrest], simply allowing the officer to briefly investigate further"); *United States v. Place*, 462 U.S. 696, 703 (1983) ("When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause").

In determining whether a *Terry* stop was supported by reasonable suspicion, a court must take into account the totality of the circumstances viewed "through the eyes of a reasonable and cautious police officer on the scene [and] guided by his experience and training." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (quotation omitted), *cert. denied*, 529 U.S. 1061 (2000).  While "[t]he reasonableness of official suspicion must be measured by what the officers knew before they conducted [the stop]," *Florida v. J.L.*, 529 U.S. 266, 271 (2000), the "[i]nformation known by one officer prior to a *Terry* stop is imputed to all officers who are involved in the investigative detention." *United States v. Hoskie*, 2000 WL 1052022, *4 (D. Conn. 2000); *see also Illinois v. Andreas*, 463 U.S. 765, 771, n.5 (1983) (knowledge of one officer presumed to be shared by all involved in investigation).

On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure. *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir.1980) (citations omitted), *cert. denied*, 450 U.S. 917 (1981); *United States v. Bayless*, 921 F. Supp. 211, 213 (S.D.N.Y. 1996).  Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence, *United States v. Bayless*, 921 F. Supp. at 213, that the search or

seizure did not violate the Fourth Amendment. *United States v. Arboleda*, 633 F.2d at 989; *see also United States v. Bonilla Romero*, 836 F.2d 39, 45 (1st Cir.1987) ("[w]hen it has acted without a warrant, the ultimate burden of persuasion is then upon the government to show that its evidence is not tainted") (citing *Alderman v. United States*, 394 U.S. 165, 183 (1969)), *cert. denied*, 488 U.S. 817 (1988).

Considering the totality of the facts before me, I find that Sergeant Ussia was justified in his initial pursuit and ultimate apprehension of Campbell and that the seizure of the narcotics from Campbell's person and the firearm from the foyer at 500 Garson Avenue did not violate his constitutional rights. Specifically, Ussia received a call for a burglary in progress for 452 Garson Avenue, which is located in an area known to have a high incidence of robberies and gun-related activity. As he responded to the call, Ussia observed Campbell walking on the sidewalk. (Tr.A 10-11). Ussia twice called out to Campbell by name and asked him to stop. (Tr.A 9-13, 47). Rather than stopping, however, Campbell ran away. (Tr.A 13). Ussia followed Campbell in his police car and observed him slip and fall three times on the icy sidewalk. As Campbell was running, Ussia saw him attempt to pull an object out of his sweatshirt pocket. (Tr.A 15). By the third time Campbell fell, Campbell was able to partially remove the item, which Ussia observed to be a shiny object that he believed to be a gun. (Tr.A 16).

Whether Ussia would have been justified in conducting a *Terry* stop at the time he initially observed Campbell is a question this Court need not resolve. Even if Ussia's initial request for Campbell to stop was an attempt to perform a *Terry* stop, Campbell fled and did not submit to any show of authority. As the Supreme Court has determined, an officer's mere attempt to conduct a stop does not constitute a seizure under the Fourth Amendment. *California*

*v. Hodari D.*, 499 U.S. 621, 626 (1991).  For a seizure to occur, there must be "*either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority."  *Id.* at 626 (emphasis in original); *see United States v. Swindle*, 407 F.3d 562, 572-73 (2d Cir. 2005) (attempted traffic stop that would have been unsupported by reasonable suspicion did not violate Fourth Amendment because defendant did not submit to officer's authority, but continued to drive and eventually fled on foot), *cert. denied*, 126 S. Ct. 279 (2005).

   I find that Campbell's flight, considered in combination with Ussia's observations and familiarity with Campbell, certainly created reasonable suspicion for Ussia to suspect that criminal activity was afoot, justifying his efforts to stop Campbell to further investigate.  *See Terry*, 392 U.S. at 30; *see Illinois v. Wardlow*, 528 U.S. at 124 (flight of suspect one factor supporting reasonable suspicion).  As Campbell continued to flee and partially removed a shiny object that Ussia was "fairly convinced" was a gun, that reasonable suspicion ripened into probable cause for arrest, further justifying Ussia's continued pursuit.

   When he reached 500 Garson Avenue, Campbell ran into the foyer leading to the upstairs apartment.  (Tr.A 19).  Campbell tried to close the door behind him, but Ussia and Smith, who had arrived to assist, prevented the door from closing and pulled Campbell back outside.  As they did so, they heard an object fall to the floor with a "thud."  (Tr.A 18-20).

   Although the Fourth Amendment generally forbids entry into a private residence without a warrant, Ussia and Smith's minimal entry into the foyer at 500 Garson Avenue to apprehend Campbell was proper pursuant under the "hot pursuit" doctrine.  *See United States v. Santana*, 427 U.S. 38, 42-43 (1976) (permitting police entry of private dwelling to pursue fleeing felon).  Under that doctrine, "a warrantless intrusion [into a private residence] may be justified by

hot pursuit of a fleeing felon, or imminent destruction of evidence, . . . or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling." *Olson*, 495 U.S. at 100. Here, the fact that Campbell was observed, in the middle of the night, carrying an object believed to be a gun and as he was attempting to flee into a private residence that the pursuing officers thought was not his[5] created exigent circumstances sufficient to allow the officers to pursue him into the open foyer.

Once Campbell was apprehended and restrained, Smith looked on the floor of the foyer and observed the chrome-plated handgun. (Tr.A 23). Campbell was then searched incident to his arrest, and nineteen bags of crack cocaine were discovered in his pockets. (Tr.A 30). It is well-established that following a valid arrest, a law enforcement officer may conduct a warrantless search of the arrestee's person and the area within his immediate control – that is, the area from which the arrestee might access a weapon or destroy evidence. *Maryland v. Buie*, 494 U.S. 325, 327 (1990); *Chimel v. California*, 395 U.S. 752, 763, 768 (1969) (lawful arrest justifies a contemporaneous warrantless search of person arrested and of the immediate surrounding area); *see also United States v. Robinson*, 414 U.S. 218, 236 (1973) ("[i]t is the fact of the lawful arrest which establishes the authority to search"). Because I find that Campbell's arrest was based upon probable cause, the contemporaneous search of his person and the foyer in which he was apprehended was therefore constitutionally permissible as a search incident to his arrest.

Alternatively, the officers were also entitled to re-enter the foyer to retrieve the firearm pursuant to the exigent circumstances exception. "The Fourth Amendment does not

---

[5] As stated earlier, Ussia testified that during his arrest the previous month Campbell had identified his residence at 152 Pennsylvania Avenue, a location where Ussia had in fact had previous contact with Campbell earlier that fall. (Tr.A 9).

require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Warden v. Hayden*, 387 U.S. 294, 298-99 (1967). "The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an urgent need to render aid or take action." *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (internal quotations omitted), *cert. denied*, 498 U.S. 1119 (1991). Here, Ussia observed Campbell trying to remove a shiny object from his sweatshirt pocket that he believed to be a firearm. Shortly thereafter, while struggling to remove Campbell from the foyer at 500 Garson Avenue, Ussia heard a heavy object drop to the floor with a "thud." At that point it was certainly reasonable for Ussia to believe that Campbell had dropped the firearm in the foyer. The presence of a firearm, especially if it were loaded,[6] certainly posed a threat to the police, the occupants of the two residences accessed through the foyer, as well as the general public, and thus justified the officers' re-entry into the foyer to recover it. *See United States v. Guadalupe*, 363 F. Supp. 2d 79, 82 (D. Conn. 2004) (finding exigent circumstances existed to enter apartment in which suspect had thrown gun that companion had entered because it "presented an imminent threat to the officers and other occupants at the building").

        Accordingly, upon the totality of the facts presented, I find that Ussia was justified in his pursuit, arrest and search of Campbell's person and of the foyer at 500 Garson Avenue and that the seizure of evidence did not violate Campbell's constitutional rights. It is therefore my recommendation that Campbell's motion to suppress the firearm and crack cocaine be denied.

---

[6] Ussia testified that it was in fact loaded with seven rounds of ammunition. (Tr.A 32).

## **CONCLUSION**

For the foregoing reasons, it is my recommendation that Campbell's motion to suppress tangible evidence **(Docket # 15)** be **DENIED**.

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      September  18 , 2006

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[7]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

<pre>
                                              s/Marian W. Payson
                                              MARIAN W. PAYSON
                                              United States Magistrate Judge
</pre>

Dated: Rochester, New York
       September  18 , 2006

---

[7] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).